**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-21-01581-001-TUC-SHR (MSA) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Gustavo Adolfo Guevara-Lopez, | |
| Defendant. | |

Before the Court are Defendant Gustavo Adolfo Guevara-Lopez's motion to suppress evidence obtained in violation of the Fourth Amendment and motion to suppress evidence obtained in violation of *Miranda v. Arizona*. (Docs. 21, 22.) The motions have been fully briefed, and an evidentiary hearing was held on February 18, 2022. (Docs. 24, 25, 29.) For the following reasons, the Court finds that the Fourth Amendment challenge lacks merit, but that a *Miranda* violation occurred.

**Background**

On June 13, 2021, at approximately 2:30 p.m., Deputy Sheriff Jeffrey Baptista was patrolling Flowing Wells Park when he noticed a man sitting in a dark blue Ford F-150. (Tr. 9–10.) The truck's engine was off, the driver's door was open, and the man was sitting in the driver's seat looking at his cellphone. (Tr. 10, 22.) The truck was the only vehicle in the parking lot, and there were no other people nearby. (Tr. 9–10.)

Deputy Baptista, who was in a marked patrol vehicle, used his mobile data computer to run a check of the truck's license plate number. (Tr. 7, 11.) Mobile data computers are

connected to the Arizona Motor Vehicle Division (MVD), the National Crime Information Center (NCIC), and a database maintained solely by the Pima County Sheriff's Department (Spillman database). (Tr. 11, 14–15.) A single query will provide a return from all databases that contain relevant information. (Tr. 11.) In Deputy Baptista's experience, the information in NCIC returns is "almost always accurate." (Tr. 74–75.)

Deputy Baptista's query produced a return from the MVD. (Pl.'s Ex. 1.) The return listed Defendant's name, Gustavo Adolfo Guevara-Lopez, as well as his date of birth. (Tr. 13.) Deputy Baptista then queried the name and date of birth. (Tr. 13.) The second query produced returns from the Spillman and NCIC databases. (Pl.'s Exs. 2, 3.) The Spillman return included a "Registered Sex Offender" alert. (Tr. 16.) This alert concerned Deputy Baptista because the man in the truck was in a park frequented by children. (Tr. 17.)

The NCIC return included a description of Guevara-Lopez, which matched the man in the truck. (Tr. 19.) The return also indicated that Guevara-Lopez was a registered sex offender, although it cautioned: "DO NOT SEARCH, DETAIN, OR ARREST BASED SOLELY ON THIS RECORD." (Tr. 17–18.) In addition, the return indicated that Guevara-Lopez was born in Honduras, that he had been "DEPORTED," and that he was "OUT OF COUNTRY." (Tr. 19–20.) This information led Deputy Baptista, who previously worked for the United States Marshals Service and has knowledge about illegal reentry, to conclude that Guevara-Lopez had probably served time in prison on a sex-offense conviction and then been deported. (Tr. 6, 20.) Deputy Baptista also concluded that, if Guevara-Lopez had returned to the United States, he probably would be guilty of a federal illegal-reentry charge. (Tr. 21.)

The foregoing records check took approximately one minute and occurred while Deputy Baptista was driving slowly past the truck. (Tr. 18–19.) During these moments, Deputy Baptista called out the license plate number on his radio and requested a second deputy. (Tr. 56; Pl.'s Ex. 4.) He then turned his patrol vehicle around, waited a few moments, and drove towards the truck. (Tr. 19.) He did not activate his vehicle's lights or siren, and he parked near the rear of the truck on the driver's side, far enough away that he

was not blocking the truck from leaving. (Tr. 21–22, 41; Pl.'s Ex. 9.)

Deputy Baptista, who was in uniform and carrying a firearm, taser, and baton, had three concerns as he walked towards the truck: the heat, which he believed was cause for conducting a welfare check; the sex-offender alert; and the possibility that the man was a deported felon. (Tr. 21–22, 38–39, 66.) Deputy Baptista stopped a few feet away from the man, said "good afternoon," and identified himself. (Tr. 22.) He then asked how the man was doing. (Tr. 22.) The man responded, in broken English, that he was okay. (Tr. 23.) Deputy Baptista, who does not speak Spanish, then formed a "c" shape with his left index finger and thumb and asked, "do you have your ID?" (Tr. 23–24.) The man then turned over a Honduras identification card. (Tr. 24–26; Pl.'s Exs. 5, 6.) The photograph, name, and birthdate on the card confirmed that Defendant was the occupant of the truck and the person referred to in the MVD, Spillman, and NCIC returns. (Tr. 26–27.)

Deputy Baptista asked Defendant if he "mind[ed] stepping out of the [truck]," and Defendant exited the vehicle. (Tr. 29–30.) Deputy Baptista then asked Defendant "to take a seat on the curb," and Defendant sat down. (Tr. 30.) Defendant remained on the curb, unrestrained, for much of the remaining encounter. (Tr. 30.) Deputy Baptista eventually returned to his patrol vehicle. (Tr. 29, 80.) During his interaction with Defendant, Deputy Baptista never raised his voice or otherwise spoke authoritatively, nor did he unholster or otherwise draw attention to his weapons. (Tr. 23, 39–40, 67.)

A few minutes later (about five minutes after the call for assistance), Deputy Manuel Ruiz Torres arrived. (Tr. 56–57; Pl.'s Ex. 4.) Deputy Torres, who was also uniformed and armed, greeted Defendant before walking over to speak with Deputy Baptista at his patrol vehicle. (Tr. 83–84, 87–90.) Deputy Baptista instructed Deputy Torres, who speaks Spanish, to question Defendant about the sex-offender alert. (Tr. 31, 91–92.) In response to questioning, Defendant admitted that he had served a prison sentence in Texas for a sex-offense conviction. (Tr. 95.) He claimed that he had returned to Honduras voluntarily after his release from prison. (Tr. 95.) However, he later admitted that he had been deported multiple times after reentering the United States through California. (Tr. 98.) During this

interaction, Deputy Torres never raised his voice or otherwise spoke authoritatively, nor did he unholster any of his weapons. (Tr. 89–90, 95–96.)

After returning to his patrol vehicle (and while Deputy Torres was questioning Defendant), Deputy Baptista called his sergeant and the supervisor of the sex crimes unit. (Tr. 27.) Deputy Baptista then called Defendant's friend, who confirmed information provided by Defendant and stated that he would take possession of the truck. (Tr. 36–37, 58, 60–61.) Deputy Baptista then called United States Border Patrol to provide notice that he had detained a possible deported felon and inquire whether border patrol wanted to take custody. (Tr. 32.) The call to border patrol occurred between 30 and 40 minutes after Deputy Baptista first encountered Defendant. (Tr. 55–56.)

A border patrol employee confirmed that Defendant had been previously deported, and that an agent would come to take custody. (Tr. 32.) Deputy Baptista then handcuffed Defendant, conducted a pat-down search for weapons, and placed Defendant in the back of a patrol vehicle. (Tr. 33.) A border patrol agent, Victor Ramos, Jr., arrived between 20 and 30 minutes later and took custody of Defendant. (Tr. 34–35, 37.) During their encounter with Defendant, neither Deputy Baptista nor Deputy Torres read Defendant his *Miranda* rights. (Tr. 64, 70, 108.)

When Agent Ramos arrived, he observed Defendant sitting in the back of Deputy Baptista's patrol vehicle. (Tr. 114–16.) Agent Ramos spoke briefly with Deputy Baptista, then opened the patrol vehicle's door and greeted Defendant. (Tr. 116.) In Spanish, Agent Ramos asked about Defendant's citizenship, and Defendant replied that he was from Honduras. (Tr. 116–17.) Agent Ramos then asked if Defendant knew why Agent Ramos was there, and Defendant replied, "[b]ecause I don't have papers." (Tr. 117–18.) Agent Ramos then placed his handcuffs on Defendant and transferred him to the border patrol vehicle. (Tr. 118.)

During the drive to the border patrol station, Defendant admitted that he had been deported multiple times. (Tr. 120.) He also admitted that he had been convicted of an offense involving a minor. (Tr. 120.) Agent Ramos initially could not recall whether these

statements were made in response to questioning, but he eventually testified that they were. (Tr. 122–23.) Agent Ramos did not read Defendant his *Miranda* rights at any point during their encounter, nor did he witness anyone else do so. (Tr. 128–30.)

### Motion to Dismiss: Fourth Amendment

Defendant contends that he was seized without reasonable suspicion in violation of the Fourth Amendment. The Court disagrees.

### I.   The encounter was initially consensual but transformed into a seizure.

A consensual encounter between an individual and the police does not implicate the Fourth Amendment. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "[A]n initially consensual encounter . . . can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion)). However, an encounter does not lose its consensual nature "simply because a police officer approaches an individual and asks a few questions," and the police are free to ask for identification "so long as [they] do not convey a message that compliance with their request[] is required." *Bostick*, 501 U.S. at 434, 437. "This is true whether an officer approaches a person who is on foot or a person who is in a car parked in a public place." *United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007).

In this case, the encounter between Deputy Baptista and Defendant was initially consensual. The encounter occurred in a public park around midafternoon. *See United States v. Brown*, 996 F.3d 998, 1005 (9th Cir. 2021) (relying on the fact that the encounter occurred during the day and in a public place). While no one else was around, nothing about this environment is inherently coercive. Deputy Baptista did not activate his patrol vehicle's lights or siren as he approached, and he parked away from Defendant's truck, in a way that would not prevent Defendant from driving away. *See United States v. Summers*, 268 F.3d 683, 687 (9th Cir. 2001) (finding that no seizure occurred although the officer's patrol vehicle "partially blocked" the defendant's parked car). Deputy Baptista was alone

during the initial encounter. *Cf. Orhorhaghe v. I.N.S.*, 38 F.3d 488, 494 (9th Cir. 1994) (finding that the presence of three officers supported finding a seizure). Although Deputy Baptista was uniformed and armed, he did not unholster his weapons or otherwise draw attention to them. *See United States v. Drayton*, 536 U.S. 194, 205 (2002) (stating that "[t]he presence of a holstered firearm . . .  is unlikely to contribute to the coerciveness of [an] encounter absent active brandishing of the weapon). Finally, Deputy Baptista spoke in a conversational tone when he greeted Defendant and asked to see identification. *See id.* at 204 (noting that officers did not use "an authoritative tone of voice").

Deputy Baptista did not advise Defendant that he could refuse the request for identification. This is a relevant factor that supports finding a seizure. *See Orhorhaghe*, 38 F.3d at 496 (finding that the officers' failure to "advise [the defendant] that he was free to decline their instructions and to terminate the encounter" supported finding a seizure). However, it is not enough by itself. As the Supreme Court has explained, the fact that most people "will respond to a police request . . . without being told they are free not to respond[] hardly eliminates the consensual nature of the response." *Delgado*, 466 U.S. at 216.

Notably, in *Washington*, the United States Court of Appeals for the Ninth Circuit found a consensual encounter in similar (but arguably more coercive) circumstances. There, at approximately midnight, an officer approached a man in a parked vehicle, shone a flashlight into the vehicle, and asked for permission to search the man's person, and the man agreed. *Washington*, 490 F.3d at 767–68. In finding that this was a consensual encounter, the court explained:

> We conclude that although [officer] Shaw conceded he suspected Washington of no criminal activity, Shaw's initial encounter with Washington was not a seizure and did not implicate the Fourth Amendment. In approaching the scene, Shaw parked his squad car a full car length behind Washington's car so he did not block it. Shaw did not activate his sirens or lights. Shaw approached Washington's car on foot, and did not brandish his flashlight as a weapon, but rather used it to illuminate the interior of Washington's car. Although Shaw was uniformed, with his baton and firearm visible, Shaw did not touch either weapon during his encounter with Washington. Shaw's initial questioning of Washington was brief and consensual, and the district court found that Shaw was cordial and courteous.

> Under these circumstances, the district court correctly concluded that a reasonable person would have felt free to terminate the encounter and leave.
>
> In sum, officer Shaw was entitled to question Washington for investigatory purposes, and the mere asking of questions, including asking for permission to search Washington's person, raised no Fourth Amendment issue so long as a reasonable person in Washington's situation would have felt free to leave.

*Id.* at 770 (internal citation omitted); *see United States v. Kim*, 25 F.3d 1426, 1430–31 (9th Cir. 1994) (holding that no seizure occurred when officers partially blocked a parked car, approached the car on foot, and requested permission to question the car's occupants).

Although Defendant was not seized when he provided his identification card to Deputy Baptista, that "does not preclude the possibility" that a seizure occurred thereafter. *Washington*, 490 F.3d at 771. The Court concludes that the encounter transformed into a seizure only moments later, when Deputy Baptista asked Defendant to step out of the vehicle and have a seat on the curb. Although these requests were phrased as questions, they would have conveyed to a reasonable person that Deputy Baptista—who had possession of the identification card—would not allow the person to drive away or otherwise leave.[1]

## II. The seizure was supported by reasonable suspicion.

An officer has reasonable suspicion when, under the "totality of the circumstances," he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). This "level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). It "depend[s] upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). The standard "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States*

---

[1]  If a seizure did not occur here, then one undoubtedly occurred minutes later, when Deputy Baptista walked to his patrol vehicle in possession of the identification card, leaving Defendant behind on the curb. (He kept possession of the card until Agent Ramos arrived. (Tr. 118.)) No reasonable person would have felt free to leave in that situation.

1   *v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 418).

2       Here, the seizure was justified by reasonable suspicion. Before making contact with

3   Defendant, Deputy Baptista learned from the NCIC return that a man named Gustavo

4   Adolfo Guevara-Lopez was born in Honduras, subject to sex-offender registration in the

5   United States, and out of the country after being deported. This information was reliable

6   because, in Deputy Baptista's experience, information in NCIC returns is "almost always

7   accurate." In addition, Deputy Baptista knew from his experience working for the United

8   States Marshals Service that if Guevara-Lopez had returned to the United States, he likely

9   would have committed a federal immigration offense. Then, during the initially consensual

10  encounter, Defendant turned over a Honduras identification card, which confirmed that he

11  was the man to whom the NCIC return pertained. At that moment, Deputy Baptista had "a

12  particularized and objective basis" for suspecting that Defendant had committed a federal

13  immigration offense.

14      Resisting this conclusion, Defendant argues that it was illegal for Deputy Baptista

15  to act on the NCIC return without verifying its content. He points out that NCIC "policy"

16  requires verification before an officer can act on a return. (Doc. 21-2.) This argument is

17  both legally and factually incorrect. The verify-first policy does not carry the force of law.

18  In addition, it is inconsistent with the concept of reasonable suspicion, which "allows

19  officers to draw on their own experience," and which cannot be reduced to "a neat set of

20  legal rules." *Arvizu*, 534 U.S. at 273–74 (quoting *Ornelas v. United States*, 517 U.S. 690,

21  695–96 (1996)). Furthermore, Deputy Baptista did not "act" on the return in the manner

22  contemplated by NCIC policy. (*See* Doc. 21-2 at 2.) He merely sought a consensual

23  encounter; he did not search, detain, or arrest Defendant based on the return.

24      Defendant also makes much of the fact that Deputy Baptista stated, in his written

25  report, that he did not have reasonable suspicion until he called United States Border Patrol

26  and confirmed that Defendant had previously been deported. This fact is irrelevant. The

27  standard for reasonable suspicion, like that for probable cause, is objective; as such,

28  reasonable suspicion can exist despite an officer's subjective belief that it does not. *See*

1  *Florida v. Royer*, 460 U.S. 491, 507 (1983) (plurality opinion) (stating that an officer's

2  subjective belief that probable cause was lacking did not prevent the state from justifying

3  the stop based on probable cause). Here, the facts known to Deputy Baptista established

4  reasonable suspicion, regardless of what he subjectively thought about them.

5      The Court finds that the encounter between Deputy Baptista and Defendant was

6  initially consensual, and that Deputy Baptista had reasonable suspicion when the encounter

7  turned into a seizure. The Court will recommend that the motion to dismiss be denied.[2]

8                    **Motion to Dismiss: *Miranda v. Arizona***

9      Defendant contends that he was subjected to custodial interrogation without first

10  being warned pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In response, the

11  Government concedes that some of Defendant's statements were obtained in violation of

12  *Miranda*, but it denies that all of them were. For the following reasons, the Court agrees

13  with the Government that there was a partial *Miranda* violation.

14      Under *Miranda*, "the prosecution may not use statements, whether exculpatory or

15  inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates

16  the use of procedural safeguards effective to secure the privilege against self-

17  incrimination." 384 U.S. at 444. For purposes of *Miranda*, "'custody' is a term of art that

18  specifies circumstances that are thought generally to present a serious danger of coercion."

19  *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). There is a two-step inquiry for determining

20  whether a person is in "custody." The court must first determine, based on the totality of

21  the circumstances, whether a "reasonable person [would] have felt he or she was not at

22

23  ---
[2]      Even if Defendant had established a violation of his Fourth Amendment rights, that

24  would be only a hollow victory. "Over twenty years ago, the Supreme Court established
the general rule that a criminal defendant cannot suppress his identity, even when there has

25  been some prior illegality on the part of the government." *United States v. Ortiz-
Hernandez*, 427 F.3d 567, 577 (9th Cir. 2005) (per curiam) (citing *I.N.S. v. Lopez-

26  Mendoza*, 468 U.S. 1032, 1039 (1984)). This rule has an odd application in illegal-reentry
proceedings: Evidence of identity, including fingerprints, can be suppressed as illegally

27  obtained. But because the Government already knows the noncitizen's identity, and the
fact of identity is not suppressible, the Government may compel the noncitizen to submit

28  to additional fingerprinting, and it may rely on the new fingerprint exemplars at trial. And
because identity leads to the immigration file, the Government may rely on that as well.
*See id.*; *United States v. Garcia-Beltran*, 443 F.3d 1126, 1134–35 (9th Cir. 2006) (applying
*Ortiz-Hernandez*). As a practical matter, then, suppression is not really a remedy.

liberty to terminate the interrogation and leave." *Id.* at 509 (alteration in original) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). However, "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Id.* Accordingly, the court must also determine "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

Here, the parties agree that Defendant was in custody when he was handcuffed and placed in the back of Deputy Baptista's patrol vehicle. They also agree that a *Miranda* violation occurred when Agent Ramos questioned Defendant during the drive to the border patrol station. The Government argues, however, that Agent Ramos did not "interrogate" Defendant while he was still in Deputy Baptista's patrol vehicle. This argument is unavailing. Agent Ramos's questions (what country are you a citizen of; why am I here) amounted to interrogation because he "had reason to suspect that [Defendant] was in this country illegally and the questions . . . were 'reasonably likely' to elicit responses which would substantiate the charge that [Defendant] had violated 8 U.S.C. § 1326." *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1047 (9th Cir. 1990). Therefore, Defendant's responses to those questions ("I'm from Honduras"; "Because I don't have papers") must also be suppressed. (Tr. 117–18.)

The Government also argues that Defendant's statements to Deputy Torres are admissible because Defendant was not in "custody" for purposes of *Miranda* when he made them. The Court agrees. Although a reasonable person would not have felt free to terminate the questioning and leave, the questioning did not occur in the type of coercive environment to which *Miranda* was intended to apply.

Multiple factors support this conclusion. The questioning occurred at a public park during the daytime. Although no one else was around, this public setting made it unlikely that Deputy Torres would "use illegitimate means to elicit self-incriminating statements . . . ." *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984). The environment was not police-dominated: only two deputies were present, and one was in his patrol vehicle for much of the questioning. Deputy Torres stood several feet away from Defendant and spoke in a

conversational tone. (Tr. 94–95.) When the questioning began, Defendant had been detained for only a brief period. *See United States v. Hudgens*, 798 F.2d 1234, 1237 (9th Cir. 1986) (stating that a 45-minute interrogation weighed against a finding of custody). Defendant was not handcuffed or otherwise physically restrained, and he was allowed to walk to his truck to get a bottle of water. *See id.* at 1236 (stating that the lack of physical restraints weighed against a finding of custody). He also had possession of his cellphone. (Pl.'s Ex. 11.)

Given the foregoing, the Court finds that Defendant was not in custody for purposes of *Miranda* until he was handcuffed and placed in the back of Deputy Baptista's patrol vehicle. The Court will recommend that all statements made after that point be suppressed.

**IT IS RECOMMENDED** that the motion to suppress evidence obtained in violation of the Fourth Amendment (Doc. 21) be **denied**.

**IT IS FURTHER RECOMMENDED** that the motion to suppress evidence obtained in violation of *Miranda* (Doc. 22) be **granted in part** as set forth above.

The parties shall have fourteen days from the date of service of this recommendation to file specific written objections with the district court. The parties shall have fourteen days to file responses to any objections. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). No replies may be filed absent prior authorization by the district court.

Dated this 8th day of March, 2022.

Honorable Maria S. Aguilera
United States Magistrate Judge